DAVID A. FRIEDMAN *v.* CONNECTICUT BAR
EXAMINING COMMITTEE
(AC 23051)

Lavery, C. J., and Bishop and Stoughton, Js.

---

[1] The trial court rendered its judgments on July 26, 2001.

Argued February 19—officially released June 24, 2003

*Kenneth A. Votre*, with whom was *Charlene Lynton*, for the appellant (petitioner).

*John B. Farley*, with whom were *Ralph W. Johnson III* and, on the brief, *Dan E. LaBelle*, for the appellee (respondent).

*Opinion*

LAVERY, C. J. The petitioner, David A. Friedman, appeals from the judgment of the trial court, denying

his petition for admission to the bar of Connecticut. The petitioner argues that the court improperly (1) denied his petition for admission to the bar, (2) remanded this matter two times to the respondent, the Connecticut bar examining committee, for additional factual findings and (3) failed to make a determination of his current fitness to practice law. We disagree with the petitioner, and, accordingly, affirm the judgment of the trial court.

The record reveals the following facts. The petitioner, a graduate of Quinnipiac College School of Law (Quinnipiac), passed the Connecticut bar examination in 1998. On November 16, 1998, the standing committee on recommendations for Fairfield County interviewed the petitioner regarding allegations that he had cheated while in law school. Following its investigation, the standing committee recommended the petitioner for admission to the bar. On January 4, 1999, the respondent, however, notified the petitioner that it would hold a formal hearing on his application. The hearing took place on January 7 and June 25, 1999. On January 14, 2000, the respondent recommended that the petitioner be denied admission to the bar of the state of Connecticut on the basis of its finding that the petitioner "lack[ed] present good moral character."

The petitioner then filed a petition for admission to the Connecticut bar with the Superior Court, claiming that the respondent's decision constituted a manifest abuse or injustice, or was made arbitrarily, unreasonably, in abuse of discretion or without a fair investigation of the facts. By decision dated April 24, 2002, the court concluded that the respondent's findings were supported by adequate facts in the record.[1] The court,

---

[1] As will be discussed more fully, that was the third opinion issued by the court in this matter. By decisions dated November 16, 2000, and August 20, 2001, the court remanded the matter to the respondent for further proceedings. In response to these remands, the respondent issued revised decisions in an effort to comply with the court's orders.

therefore, denied the petition for admission to the bar. Thereafter, the petitioner filed the present appeal.

I

The petitioner first argues that the court improperly affirmed the respondent's decision denying his application for admission to the bar. According to the petitioner, the respondent's findings were arbitrary, unreasonable and not based on a fair investigation of the facts. We disagree and conclude that sufficient evidence existed to support the respondent's decision.

"When reviewing the legal conclusions of the trial court concerning the adequacy of evidence before the respondent, we need only determine whether the respondent's finding, that the petitioner lacked good moral character, is supported in the record of the application proceedings. . . . [T]he issue before the court is whether the committee or the bar, in withholding its approval for admission, acted arbitrarily or unreasonably or in abuse of its discretion or without a fair investigation of the facts. . . . Because the trial court exercises no discretion, but rather is confined to a review of the record before the [respondent], we are not limited to the deferential standard of manifest abuse or injustice when reviewing its legal conclusions about the adequacy of the evidence before the [respondent]." (Citations omitted; internal quotation marks omitted.) *Doe* v. *Connecticut Bar Examining Committee*, 263 Conn. 39, 50, 818 A.2d 14 (2003); *Scott* v. *State Bar Examining Committee*, 220 Conn. 812, 823, 601 A.2d 1021 (1992).

Before commencing our review, we note that "the Superior Court's role in reviewing a petition for admission is not that of factfinder." *Scott* v. *State Bar Examining Committee*, supra, 220 Conn. 822. The trier of fact, rather, "determines with finality the credibility of witnesses and the weight to be accorded their testi-

mony." (Internal quotation marks omitted.) Id. We also emphasize that "[g]ood moral character is a necessary and proper qualification for admission to the bar. . . . In this state, the ultimate burden of proving good character rests upon the applicant. . . . [W]hile there is no litmus test by which to determine whether an applicant for admission to the [b]ar possesses good moral character . . . no moral character qualification for [b]ar membership is more important than truthfulness and candor. . . . It is not enough for an attorney that he be honest. He must be that, and more. He must be believed to be honest." (Internal quotation marks omitted.) *Doe* v. *Connecticut Bar Examining Committee*, supra, 263 Conn. 51–52.

The respondent based its determination that the petitioner lacked good moral character on (1) an incident in which he allegedly brought unauthorized materials into a closed book examination while he was a student at Quinnipiac and (2) its determination that he had been untruthful in his testimony before the respondent. In that regard, the record before the respondent reveals the following facts. On September 25, 1995, the petitioner was charged with having violated subsections (A), (C) and (D) of § 3[2] of the Quinnipiac student con-

---

[2] Section 3 of the student discipline committee, student conduct code, entitled "Violations" provides in relevant part:

"The following acts are prohibited. Any student found guilty of one or more such acts shall be subject to the sanctions authorized by this code.

"A. Cheating on any examination or other law school assignment, as illustrated by, but not limited to:

"1. The unauthorized giving or receiving of aid or assistance;

"2. The unauthorized use of information;

"3. The unauthorized submission of work which has already been submitted in satisfaction of other course work;

"4. The giving or obtaining of any unfair advantage.

\* \* \*

"C. Any act which reflects adversely upon fitness to practice law. Relationship to fitness shall be construed in accordance with the American Bar Association Rules of Professional Conduct, and relevant case law.

"D. Any attempt to commit any act prohibited by this Code."

duct code in connection with his spring, 1995, constitutional law examination. The student discipline committee held hearings on the matter on August 30, September 5 and September 6, 1996. That committee heard testimony from four witnesses and received nine exhibits during those hearings.[3]

Fellow law student Lynn Fiore testified at the hearing that she sat behind the petitioner at the May 5, 1995 closed book examination. Fiore testified that prior to the examination, as she was trying to study, she overheard another law student remark to the petitioner, "What are you so nervous about? Everybody does it; no one admits it." She testified that she noticed that the petitioner was studying an outline on a white piece of paper, and that immediately prior to the examination, she saw that paper on the petitioner's desk under a single piece of white paper.[4] Fiore also testified that she overheard the petitioner ask Matthew Goldzweig, another law student, what he was leaving on his desk

---

[3] The transcripts of the proceedings before the student discipline committee were part of the record before the respondent.

[4] Fiore testified as follows:

"Q. Could you tell us what happened next?

"A. Sure. Again, this is all happening while I'm trying to study. Next, I noticed in front of me, the next time I looked up, that [the petitioner] had placed the outline that he had been studying on the desk under a single sheet of white paper.

"Q. Could you describe that outline?

"A. Yes. It was on an eight and one-half by eleven piece of white paper, blue ink, you know, writing in blue ink, every line margin to margin the width of the paper and it was—

"Q. Margin is side to side margins and top to top?

"A. Top to bottom; that's what I saw he was studying when he was standing up. Then I saw it on the desk with just a single sheet of paper over the top of it, but from where I was behind him, I could see the bottom half of it sticking out under the white sheet of paper that was on top and that was still prior to the exam beginning, but it was getting close now to that time. So, I, again, just started to study the quick outline that I had in front of me and the next thing, I believe, is the exam."

during the examination; according to Fiore, Goldzweig replied that he was taking everything off his desk.[5]

Fiore testified that once the examination began, she prepared a brief outline for the first eight to ten minutes and did not observe the petitioner. Fiore testified that when she finished preparing her outline, she looked up and saw, next to the petitioner, the white piece of paper with the blue ink that she had seen prior to the start of the examination. She was not able to read the paper and could not testify as to its contents. She did state, however, that once the examination began, she was writing constantly and could not have written as much as was written on the piece of paper she saw next to the petitioner.[6]

Goldzweig also testified at the hearing before the student discipline committee. His testimony was as follows. The petitioner was seated in front and to the right of him during the spring, 1995, constitutional law examination. When Goldzweig arrived for the examination, he noticed the petitioner studying a "condensed outline" on a piece of paper. After the proctor asked

[5] Fiore testified as follows:

"Q. What did [the petitioner] say?

"A. It was a question to Matt Goldzweig, 'What are you leaving on the desk? What are you going to leave out during the exam?' or 'What are you leaving on the desk?' and I remember, specifically, Mr. Goldzweig saying, 'I'm taking everything off of my desk,' and I remember that because I remember thinking, yes, I have to clear everything, too."

[6] Fiore testified as follows:

"Q. My conclusion is, she's aware of the amount of time she took to prepare her outline and how much she was able to write during that time, and the suggestion that has been made, that she might have that—whatever she saw on the desk might have been prepared during the exam, and I'm asking, as her opinion given how much time elapsed, could anyone have filled in a piece of paper during that time as the best evidence of that?

"A. I could not have filled in—I mean, I can only go from my own—I could not have written that much in that amount of time. I wrote nowhere near that much, and I was writing pretty much constantly what was coming to my head."

everyone to clear the desks because it was a closed book examination, Goldzweig observed the petitioner fold up the piece of paper and place it underneath the blue book. Goldzweig spent the first few minutes of the examination preparing a brief outline, and then looked up and observed that the petitioner had the outline on his desk and was referring to it.[7] Goldzweig could not testify as to the content of the document he saw; he stated, however, that it would have taken him much more than the two minutes he took to prepare his outline to create the one he saw on the petitioner's desk.

The petitioner called as a witness Yvonne Shoff, another law student who was present at the spring, 1995, constitutional law examination. The petitioner sat behind and to the left of Shoff during the examination. Shoff testified that she looked back when the examinations were being handed out and saw that the petitioner had his exam facing up and was starting to read the first page. Shoff asked the petitioner to turn his exam over, which he did. Shoff observed the petitioner for only a "split second" and did not notice anything else unusual.

The petitioner testified at the hearing. According to the petitioner, when the proctor told the students to

---

[7] Goldzweig testified as follows:

"Q. Then what happened in the exam?

"A. And then they handed out the exams, and when everyone got one, we turned it over, and then I just took my first blue book, turned it over, opened it up and scribbled a quick outline, some key words to kind of refresh my memory when I was taking the exam.

"Q. How long would you say this took you?

"A. A couple of minutes.

"Q. Then what did you do?

"A. Well, then, I kept on looking over at [the petitioner] because, I mean, I couldn't believe what he was doing. I saw that piece of paper back on his desk and he was—I mean, he took it out from underneath the blue books, and it was there. I kept looking over because that's pretty distracting when someone in front of you is cheating. I kept on looking over, and he had it on his desk and was referring to it."

put away their study materials, he "removed everything from [his] desk except for [his] pen that [he] used for the exam, a spare pen in case [he] ran out and a blank sheet of white paper." The petitioner stated that he prepared an outline once the examination began, and he identified that at the hearing as respondent's exhibit one. He testified that once he wrote that outline during the examination, it remained on his desk and he referred to it while preparing his examination answers. He testified that he did not refer to any other materials during the examination. He testified that he did not cheat on the examination, and, when asked why others believe he did, he stated that those who testified against him, particularly Goldzweig, never liked him.[8]

The student discipline committee concluded that "there is strong, positive proof which is clear, decisive and free from doubt that [the petitioner] brought an outline or other written document with him into the examination room, and hid the document for the purpose of gaining an advantage on the examination. The committee has no evidence of the contents of the document and cannot conclude that the document was of material value to [the petitioner]. Despite this, we conclude that [the petitioner] violated [§ 3 A (2) and D] of the student conduct code." The committee therefore imposed sanctions on the petitioner.[9]

---

[8] The petitioner testified as follows:

"Q. Did you cheat on this exam?

"A. No, I did not.

"Q. Do you have any explanation as to why people seem to be saying that you did?

"A. Yes, I do. I believe that the people who testified here, particularly Mr. Goldzweig, never liked me. I never liked him and, you know, I'm not hiding that fact, and I think that this was a good opportunity to try to stick it to me."

[9] The committee imposed the following sanctions: "(1) the grade received in the constitutional law course shall be reduced one full grade point; (2) [the petitioner] is reprimanded for misconduct; and (3) this decision shall be entered into the [petitioner's] law school record."

On January 24, 1997, Neil H. Cogan, dean and professor of law at Quinnipiac, reversed the decision of the student discipline committee "on the grounds that the delay in notifying [the petitioner] of the charges and the delay in bringing the charges to a hearing were excessive and may have prejudiced [the petitioner's] defense against those charges." Cogan stated, however, that he was "obligated . . . to file the materials with [the petitioner's] records for transmittal to any bar admissions committee that might have appropriate jurisdiction."

The petitioner passed the Connecticut bar examination in July, 1998. On January 4, 1999, the respondent sent a "Notice of Hearing" to the petitioner, informing him that on January 7, 1999, it would hold a hearing on his application for admission to the practice of law in Connecticut. The notice specified that the hearing would involve the proceedings following the constitutional law examination at Quinnipiac, and the petitioner's candor and credibility during the application process.[10]

A panel of the respondent committee held a hearing on the matter on January 7 and June 25, 1999. On both occasions, the petitioner testified and was represented by counsel. The petitioner testified that once the constitutional law examination began, he immediately wrote a brief outline, which he used to help him remember all of the key points that he wanted to include in his answers.[11] Fiore testified at the hearing as well. She

---

[10] Specifically, the notice stated:

"The following matters will be discussed:

"Q#16: Applicant was charged with cheating on a law school exam and found, by the Student Discipline Committee, to have violated Student Conduct Code Section [3 A (2) and D], which decision was subsequently reversed by Dean Cogan.

"Applicant's candor and credibility during the application process."

[11] The transcript reveals the following:

"Q. Mr. Friedman, why don't you give us your version of what happened that day that you took the exam?

again recounted that prior to the examination, she over-heard another law student ask the petitioner why he was so nervous and stated that "everyone does it."[12] She testified that prior to the commencement of the examination, she saw the petitioner studying a piece of paper, and, once the blue books were distributed, she saw the bottom portion of it underneath the blue book in front of the petitioner. She described that paper as "being fairly full of writing, margin to margin."

On January 14, 2000, the panel issued its decision in which it stated: "Cheating on a law school exam is an act of dishonesty. [The petitioner] perpetrated a falsehood upon the academic process at Quinnipiac College School of Law by attempting to obtain a grade which he had not earned. It is also noteworthy that the misconduct in question occurred in connection with obtaining his law degree, a requisite for becoming a member of the bar, and was an offense committed by one whose age and experience was well beyond the era of youthful indiscretion." The panel therefore found, by clear and convincing evidence, that the petitioner lacked present

"A. Okay. Exam started. I had a blank piece of paper, or two papers, on my desk. The exam proctor said, 'Begin.' I immediately started writing my outline because there was a host of points that I wanted to cover in the constitutional law exam, the sections that I didn't want to miss. I started writing. It took me about maybe five minutes to jot down, you know, the head points that I wanted to make in my answer. And then I proceeded to read the questions that were on the exam, and I started to frame my answer. And I just started thinking about the facts of the question, and I just started writing while looking at my, you know, the head points that I made once the exam had already started. I just carried it through to my conclusion. And that's what I did for every question. The initial head points that I wrote down were going to cover the entire exam because constitutional law, I know from that exam and now from the bar exam, it breaks down into maybe, you know, a few really key areas. And I wanted to make sure that I would cover those areas when I was going through my answers, and that's all I did."

[12] According to Fiore, the student said "something to the effect of—it was either, why are you so nervous, everyone does it and doesn't admit it. Or what are you so nervous about, everyone does it, no one admits it."

good moral character. Accordingly, the panel did not recommend the petitioner for admission to the Connecticut bar.

The petitioner then filed a petition with the Superior Court for admission to the Connecticut bar. On November 16, 2000, and August 20, 2001, the court remanded the matter to the respondent for further findings of fact. In response, the respondent issued revised decisions on May 9[13] and December 26, 2001.[14] Although the revised

[13] The May 9, 2001 revised decision states:

"Pursuant to article VI, § 5 (e) (iv), of the regulations of the Connecticut bar examining committee, the panel makes the following findings of fact:

"A. Issue of Cheating on Law School Exam.

"1. [The petitioner] cheated on the constitutional law examination by bringing unauthorized information into a closed book exam.

"2. The information consisted of a piece of paper with writing on it which [the petitioner] brought with him into the exam and had on his desk during the course of the exam.

"3. [The petitioner] attempted to gain an advantage by bringing unauthorized information into a closed book exam.

"B. Issue of Applicant's Candor.

"1. [The petitioner] testified under oath before this panel and denied any wrongdoing with respect to his conduct in taking the constitutional law exam.

"2. [The petitioner] testified before the Quinnipiac College School of Law discipline committee and denied any wrongdoing with respect to his conduct in taking the constitutional law exam.

"3. [The petitioner] was untruthful when he testified under oath before this panel and denied any wrongdoing.

"4. [The petitioner] was untruthful when he testified before the Quinnipiac College School of Law discipline committee and made the same denial."

[14] The additional findings of fact in the December 26, 2001 decision are as follows:

"1. The [petitioner] was not truthful in his initial answer to the panel when he described his version of what happened on the day of the exam. He was given the opportunity to admit that he brought written material into the exam with him and had that material on his desk during the exam. In his testimony, however, [the petitioner] omits any mention of the written material which, as we have found, he brought with him into the exam and had on his desk during the exam. [The petitioner] also was untruthful when he concluded his initial answer with the statement, 'and that's all I did.' . . .

"2. [The petitioner] was not truthful when he testified to the panel that the writing which other witnesses saw on his desk at the exam was 'written when the exam already started.' . . .

decisions clarified the respondent's findings of fact, its ultimate determination remained the same, i.e., the respondent did not recommend the petitioner for admission to the bar of Connecticut. The court, upon review of the petition, stated that "adequate record evidence plainly exists" to support the respondent's findings. The court, therefore, denied the petition for admission to the bar.

## A

The petitioner argues, as he did before the court, that the respondent's findings were arbitrary, unreasonable and not based on a fair investigation of the facts. Specifically, the petitioner argues that the respondent never made any independent inquiry to determine or attempt to determine the content of the alleged "crib sheet" or the use to which it was allegedly put, but rather, relied on the testimony of Fiore and the finding of the student discipline committee to conclude that he had cheated.[15] The petitioner also argues in his principal brief that the

"3. [The petitioner] was not candid before the panel when he allowed his attorney on his behalf to deny 'absolutely' the accusation that he brought unauthorized material into the law school examination, when [the petitioner] knew that that characterization was untrue. . . . In addition, [the petitioner] was not truthful when he testified at the student discipline committee that he did not have any written material on his desk at the exam other than the outline he wrote after the exam started."

[15] In fact, the petitioner argues that the student discipline committee never concluded that he had cheated. The petitioner cites the fact that the dean of the law school reversed the committee's decision and that the petitioner's grade for the course stood. According to the petitioner, if the committee had, in fact, concluded that he had cheated, his grade for the course never would have stood. The petitioner argues, therefore, that because the facts in the record do not support the conclusion that he cheated or attempted to cheat, the respondent necessarily failed to conduct a fair investigation.

With regard to that claim, we note that the dean's reversal of the committee's decision was based "on the grounds that the delay in notifying [the petitioner] of the charges and the delay in bringing the charges to a hearing were excessive and may have prejudiced [the petitioner's] defense against those charges." The dean did not express an opinion concerning the merits of the committee's finding.

respondent's "abdication of its responsibility to conduct a fair investigation is further evidenced by the lack of any facts in the record that the [respondent] investigated why Dean Cogan reversed the decision of the student discipline committee. . . . The [respondent] noted the dean's reversal in its decision, but failed to conduct any investigation from which it could be concluded that the delays *did not* prejudice [the petitioner's] defense." (Emphasis in original.)

As previously stated, "[i]n this state, the ultimate burden of proving good character rests upon the applicant." (Internal quotation marks omitted.) *Doe* v. *Connecticut Bar Examining Committee*, supra, 263 Conn. 51. As such, the respondent was under no obligation to determine the contents of the "crib sheet" or to investigate whether the delays in bringing the charges against the petitioner to a hearing prejudiced his case. The respondent was entitled, rather, to rely on the proceedings before and decision of the student discipline committee. The respondent also was permitted to rely on the testimony and evidence before it, including Fiore's testimony, in reaching its decision not to recommend the petitioner for admission to the Connecticut bar. As the court properly stated in that regard, "[t]he [respondent's] decision to believe Fiore and disbelieve [the petitioner] was a credibility decision that the [respondent] was plainly entitled to make. . . . [The petitioner's] principal argument is that Fiore could not read the actual writing in front of [the petitioner] and was thus unable to say with the requisite certainty that the writing in front of him during the exam was the same document he had studied during the exam. Fiore, however, was unambiguous in her testimony that she saw the paper in question both at the beginning of the exam and some period of time into the exam. . . . This testimony, combined with Fiore's testimony concerning [the petitioner's] pre-exam conversation with [another

student] was plainly enough to allow the [respondent] to conclude that [the petitioner] had cheated by bringing unauthorized material into a closed book exam."[16]

### B

The petitioner next argues that he established a prima facie case of good moral character. He therefore argues, by way of analogy to decisions involving attorney grievance proceedings, that the respondent was required to find, by clear and convincing evidence, that the petitioner lacked good moral character. While conceding that the respondent appears to have applied this standard, the petitioner claims that the respondent's conclusions do not follow reasonably or logically from the facts in the record. We disagree with the petitioner.

The petitioner claims that he made out a prima facie case of good moral character by way of his response to question number sixteen on his Connecticut bar application. That question asked: "Have you ever been expelled, suspended, placed on probation or been the subject of discipline by any college, university or law school? If so, explain." In response, the petitioner checked the box marked "yes" and stated: "I was charged once with using or attempting to use an unauthorized material during one of my first year exams. However, I was not convicted. In addition, absolutely no disciplinary sanctions were imposed." The petitioner argues in his principal brief that he "candidly disclosed that he was charged with using and attempting to use unauthorized material during an examination, was not convicted and was not sanctioned."

We find the petitioner's argument to be without merit. First, the petitioner's argument assumes that he did, in

---

[16] We agree with the court that the respondent was entitled to find Fiore more credible than the petitioner. See *Doe* v. *Connecticut Bar Examining Committee,* supra, 263 Conn. 58. We therefore find, contrary to the assertion of the petitioner, that there was sufficient evidence in the record to support the respondent's finding about his moral character.

fact, establish a prima facie case of good moral character. It is important to note that neither the respondent nor the court, however, found that he had established such a prima facie case. Second, the petitioner knew, by way of Dean Cogan's decision, that the materials connected with the proceedings at the Quinnipiac student discipline committee would be forwarded to the respondent for inclusion in his record. The petitioner's disclosure of the Quinnipiac proceedings, therefore, was not necessarily a demonstration of candor.[17]

Finally, we agree with the respondent that attorney grievance proceedings and bar admission proceedings are quite different; we therefore do not accept the petitioner's invitation to draw an analogy between the two. As correctly pointed out by the respondent, "[a] license to practice law is a property interest that cannot be suspended without due process." *Statewide Grievance Committee* v. *Botwick*, 226 Conn. 299, 306, 627 A.2d 901 (1993). The burden in grievance proceedings "is on the statewide grievance committee to establish the occurrence of an ethics violation by clear and convincing proof." (Internal quotation marks omitted.) *Somers* v. *Statewide Grievance Committee*, 245 Conn. 277, 290, 715 A.2d 712 (1998). The ultimate burden of proving good moral character required for admission to the bar, however, is on the applicant. *Doe* v. *Connecticut Bar Examining Committee*, supra, 263 Conn. 51.[18]

---

[17] We also question the accuracy of the petitioner's response that he was not convicted of the offense of using or attempting to use unauthorized material during an examination and was not sanctioned. Query whether it would have been more accurate to respond that the student discipline committee had found against him, but that this decision was reversed due to the delay in bringing the charges to a hearing.

[18] "Where an applicant, by affidavit or otherwise, has shown, prima facie, to the committee that he is of good moral character, it should consider evidence, if there is any, to the contrary. This may consist of evidence derived from the committee's independent investigation or from the interrogation of the applicant himself. . . . A committee's conclusion that the applicant's moral qualifications fail to meet the required standard must have rational support in the evidence before the committee." (Citation omitted.) *In re Application of Warren*, 149 Conn. 266, 274, 178 A.2d 528 (1962).

In the present case, on the basis of an exhaustive review of the record, as previously set forth, we conclude that the respondent did not act arbitrarily or unreasonably or in abuse of its discretion or without a fair investigation of the facts; see id., 50; in concluding that the petitioner lacked good moral character.[19]

## II

The petitioner next argues that the court improperly remanded the matter two times to the respondent for additional factual findings. According to the petitioner, once the court determined that the respondent's decision was not supported by factual findings, it should have simply ordered his admission to the Connecticut bar. We disagree.

"Although the [respondent] is not an administrative agency . . . the Superior Court's review of its conclusions is similar to the review afforded to an administrative agency decision." (Citations omitted.) *Scott* v. *State Bar Examining Committee*, supra, 220 Conn. 821. In that regard, "[a] trial court may . . . conclude that an administrative ruling is in some fashion incomplete and therefore not ripe for final judicial adjudication. With-

---

[19] In reaching that conclusion, we note that the petitioner in his principal brief challenges, in a footnote, the respondent's reliance on Goldzweig's testimony before the Quinnipiac student discipline committee. Because Goldzweig was not called to testify before the respondent, the petitioner argues that he was not afforded the opportunity to cross-examine him. The petitioner also contends that it does not appear that Goldzweig was unavailable to testify before the respondent.

In that regard, we note that the petitioner did cross- examine Goldzweig at the hearings before the student discipline committee and never objected to the respondent considering that testimony. More important, however, is the fact that the decisions of both the respondent and the court referenced Fiore's testimony as being the most persuasive. We agree with the respondent, therefore, that neither the opinion of the respondent nor the opinion of the court depended on Goldzweig's testimony.

out dictating the outcome of the further administrative proceedings, the court may insist on further administrative evidentiary findings as a precondition to final judicial resolution of all the issues between the parties." (Internal quotation marks omitted.) *Morel* v. *Commissioner of Public Health*, 262 Conn. 222, 228, 811 A.2d 1256 (2002); *Lisee* v. *Commission on Human Rights & Opportunities*, 258 Conn. 529, 538, 782 A.2d 670 (2001).

The court in the present case determined that the respondent's conclusions were not accompanied by findings of fact that were essential to the court's review. On that basis, we conclude that it was proper for the court to remand the matter to the respondent to make those further factual findings.

### III

The petitioner's final claim is that the court failed entirely to consider his current good moral character and fitness to practice law. The petitioner, relying on *Scott* v. *State Bar Examining Committee*, supra, 220 Conn. 812, argues in his principal brief that the matter should, "at a minimum," be remanded for additional hearings as to the petitioner's current fitness to practice law. We disagree.

The petitioner never requested that the court remand the matter for additional hearings to determine his present good character. "It is well settled that the trial court can be expected to rule only on those matters that are put before it. . . . With only a few exceptions . . . we will not decide an appeal on an issue that was not raised before the trial court. . . . To review claims articulated for the first time on appeal and not raised before the trial court would be nothing more than a trial by ambuscade of the trial judge." (Internal quotation marks omitted.) *United Technologies Corp.* v. *Commission on Human Rights & Opportunities*, 72 Conn. App. 212, 223–24, 804 A.2d 1033, cert. denied, 262 Conn.

920, 812 A.2d 863 (2002). We therefore decline to review the petitioner's claim that this matter should be remanded for an additional hearing concerning his present fitness to practice law.

We note that even if we were to review the petitioner's claim, we do not read *Scott* as standing for the proposition that an applicant is always entitled to a remand to the bar examining committee for a determination of his or her present fitness to practice law. In *Scott,* the petitioner's drug use from 1977 to 1985 resulted in numerous arrests and three convictions for possession of marijuana and controlled substances. *Scott* v. *State Bar Examining Committee,* supra, 220 Conn. 814. In 1987, following graduation from law school, the petitioner took and passed the Connecticut bar examination. Id., 815. The bar examining committee held a fact-finding hearing concerning the petitioner's qualifications for admission to the bar; the specific area of inquiry was the petitioner's criminal record. Id. Following the hearing, the executive committee of the bar examining committee voted to deny the petitioner admission to the bar. Id. The petitioner then sought review in the Superior Court, which rendered judgment ordering the petitioner admitted to the bar after concluding that the committee "could not fairly and reasonably have reached the conclusion that it did." (Internal quotation marks omitted.) Id., 814. On appeal, our Supreme Court reversed the decision of the Superior Court, concluding that the "record . . . supported the [respondent's] findings about the petitioner's lack of credibility and candor, and, consequently, his moral character and fitness to practice law . . . . " Id., 826.

The court in *Scott* later stated: "While concluding that the trial court acted improperly in rejecting the [respondent's] findings, we recognize that the appropriate inquiry when deciding whether to grant admission to the bar is whether the applicant has *present*

fitness to practice law. . . . . Fitness to practice law does not remain fixed in time. While the [respondent] found the petitioner unfit to practice law in 1989, it might not reach that conclusion today. Thus, the trial court should remand the petitioner's application to the [respondent] for a new hearing to review any additional relevant evidence submitted by the petitioner concerning his present fitness to practice law." (Citations omitted; emphasis in original.) Id., 829.

In *Scott*, the bar examining committee was concerned with the petitioner's prior criminal record and his explanations of his prior criminal record. In that case, counsel for the respondent agreed, *under the circumstances of that case*, that a remand for a new hearing concerning the petitioner's rehabilitation would be appropriate. Id., 829 n.13. In the present case, the respondent determined, following a hearing, that the petitioner lacked good moral character on the basis of the incident at Quinnipiac and his testimony during the hearing. Unlike the situation in *Scott*, there is no agreement by the respondent regarding a remand for consideration of the petitioner's rehabilitation. We conclude that in the present case, a new hearing concerning the petitioner's present fitness to practice law is not required.[20]

The judgment is affirmed.

In this opinion STOUGHTON, J., concurred.

---

[20] Our conclusion is supported by *Doe* v. *Connecticut Bar Examining Committee*, supra, 263 Conn. 39. In that case, the respondent issued a decision recommending that the petitioner not be admitted to the bar. The petitioner then filed a petition requesting that the court admit him to the bar. The court reversed the respondent's decision and remanded the petitioner's petition to the respondent for a new hearing before a different panel of the respondent to determine the petitioner's present fitness to practice law. Id., 44. Our Supreme Court concluded that there was sufficient evidence in the record to support the respondent's finding about the petitioner's moral character. Id., 58. The court, therefore, remanded the matter to the trial court with direction to render judgment for the respondent on the petitioner's petition for admission to the bar. Id., 70. The court did not order the trial court to remand the matter to the respondent for a hearing regarding the petitioner's present fitness to practice law.

BISHOP, J., dissenting. While I agree with the observation of my colleagues that a candidate for the bar has no property interest in a license to practice law, an applicant does, nevertheless, have a liberty interest in realizing his reasonable expectations. Moreover, this liberty interest cannot be denied an applicant without according him due process. Because I believe that the undertakings by the Connecticut bar examining committee (committee) denied the petitioner due process and did not constitute a fundamentally fair investigation of the petitioner's present moral fitness for practice, I respectfully dissent.

I am concerned that the trial court, while properly deferring to the fact-finding function of the committee, did not adequately scrutinize the fairness of the committee's process. As a consequence, the court, in the name of deference to fact-finding, incorrectly yielded its responsibility to oversee the fairness of the admissions application process to the committee. In affirming the judgment of the trial court, I believe that we have completely ceded to the committee the uniquely judicial function of determining whether the petitioner should be admitted to practice.

Although a bar applicant does not have a property right to a law license, it is nonetheless a right accorded significant protections. As stated by the United States Supreme Court in 1971, "[t]he practice of law is not a matter of grace, but of right for one who is qualified by his learning and his moral character." *Baird* v. *State Bar of Arizona*, 401 U.S. 1, 8, 91 S. Ct. 702, 27 L. Ed. 2d 639 (1971). Eight years later, Justice Stevens opined that "[i]n a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed. . . . Although the boundaries of the 'liberty' protected by the Fourteenth Amendment have never been conclusively surveyed, it is clear that they encompass, not merely [the] freedom from bodily restraint

and the rights conferred by specific provisions of the Constitution . . . but also the privileges long recognized at common law as essential to the orderly pursuit of happiness. . . . Among those privileges is the right to hold specific private employment and to follow a chosen profession . . . including the practice of law." (Citations omitted; internal quotation marks omitted.) *Leis* v. *Flynt*, 439 U.S. 438, 452 n.17, 99 S. Ct. 698, 58 L. Ed. 2d 717 (1979) (Stevens, J., dissenting). Shortly thereafter, the court held that the opportunity to practice law is a "fundamental" right within the meaning of the privileges and immunities clause of the United States constitution. *Supreme Court of New Hampshire* v. *Piper*, 470 U.S. 274, 283, 105 S. Ct. 1272, 84 L. Ed. 2d 205 (1985). Consistent with these expressions of the constitutional footing of the right to practice one's chosen profession, the court also has held that "[a] State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment. *Schware* v. *Board of Bar Examiners*, 353 U.S. 232, 238–39, [77 S. Ct. 752, 1 L. Ed. 2d 796 (1957)]." *Willner* v. *Committee on Character & Fitness*, 373 U.S. 96, 102, 83 S. Ct. 1175, 10 L. Ed. 2d 224 (1963).

To state that an applicant for a license to practice law is entitled to due process, however, does not complete the discussion. "[D]ue process. . . is not a technical conception with a fixed content unrelated to time, place and circumstances. . . . [D]ue process is flexible and calls for such procedural protections as the particular situation demands." (Internal quotation marks omitted.) *Kostrzewski* v. *Commissioner of Motor Vehicles*, 52 Conn. App. 326, 336, 727 A.2d 233, cert. denied, 249 Conn. 910, 733 A.2d 227 (1999). As a guide to the level of procedural process necessary, the United States Supreme Court has identified three factors for consider-

ation: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedure used and the probable value, if any, of additional substitute procedural safeguards; and (3) the state's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail. *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976); see also *Kostrzewski* v. *Commissioner of Motor Vehicles*, supra, 336–37.

At a minimum, it is basic that the decision of the state to grant or deny a license is subject to a hearing requirement. *Arnett* v. *Kennedy*, 416 U.S. 134, 94 S. Ct. 1633, 40 L. Ed. 2d 15 (1974). "[T]he absence of a hearing would allow the State to be arbitrary in its grant or denial, and to make judgments on grounds other than the fitness of a particular person to pursue his chosen profession." Id., 179 (White, J., dissenting in part). At such a hearing, an applicant is entitled to procedural process that includes, as essential to due process, "[the right] to confront and cross-examine witnesses and to call witnesses in one's own behalf . . . . *State* v. *Mastropetre*, 175 Conn. 512, 520, 400 A.2d 276 (1978), quoting *Chambers* v. *Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)." (Internal quotation marks omitted.) *State* v. *Askew*, 53 Conn. App. 236, 238, 729 A.2d 238 (1999).

Finally, the due process rights mandated by the federal constitution include a notice provision so that "in all cases in which admission to the bar is to be denied on the basis of character, the applicant, at some stage of the proceedings prior to such denial, must be adequately informed of the nature of the evidence against him and be accorded an adequate opportunity to rebut [that] evidence." *Willner* v. *Committee on Character & Fitness*, supra, 373 U.S. 107 (Goldberg, J., concurring).

A bar applicant's right to due process is illusory unless it is safeguarded by the judiciary. It is my impression, however, that in furtherance of our tradition of deference to the committee's fact-finding responsibility, we have, over time, ceded the entire process, and have, as a practical matter, abdicated our gatekeeping role in determining admission to the bar in favor of the committee, which is comprised, for the most part, of nonjudges.[1] I start with the proposition, found in *Heiberger* v. *Clark*, 148 Conn. 177, 185, 169 A.2d 652 (1961), that "[f]ixing the qualifications for, as well as admitting persons to, the practice of law in this state has ever been an exercise of judicial power."

More recently, our Supreme Court, in *Scott* v. *State Bar Examining Committee*, 220 Conn. 812, 817, 601 A.2d 1021 (1992), affirmed that fixing qualifications and admitting persons to the bar is an exercise of judicial power, commenting, however, that "[t]his power has been exercised with the assistance of committees of the bar appointed and acting under rules of court." (Internal quotation marks omitted.) The court continued, stating that "[a]lthough these committees have a broad power of discretion, they act under the court's supervision. . . . It is the court, and not the bar, or a committee, which takes the final and decisive action." (Citations omitted; internal quotation marks omitted.) Id.

The idea that the decision to admit or deny admission to the bar is a uniquely judicial function is a notion not deeply rooted in history. At an earlier time, it appears that courts viewed the bar application process as one of collaboration with the bar in which the bar played a significant role in shaping the process and determining

---

[1] That comment is intended, by no means, to be a criticism of the nonjudge members of the committee who are, as a group, lawyers of great learning, integrity and generosity. They are, nevertheless, not judges.

an applicant's fitness to practice law. My research indicates that the tradition of broad deference to the court's bar committee finds its roots in the case of *O'Brien's Petition*, 79 Conn. 46, 63 A. 777 (1906). I believe, respectfully, that close examination of *O'Brien's Petition* reveals that much of its reasoning has been made unreliable by superseding United States Supreme Court decisions. The court has held that an applicant does, in fact, have a fundamental right to practice in his or her chosen field, including the practice of law. *O'Brien's Petition* has been undermined additionally by the changed relationship between the bench and the bar as it concerns the bar admissions process.

In *O'Brien's Petition*, the petitioner had sought a court hearing on his qualifications in the face of a recommendation from the Fairfield County bar that his application for admission be denied. The record reveals that, at the time, the rules of practice provided that the court could admit to practice only candidates who had received favorable recommendations from the admission committee of their county bars. On that basis, the trial court declined to hear evidence of the petitioner's character, ruling that it had no power to determine his qualifications in light of the county bar's negative recommendation.

In upholding the trial court's decision, our Supreme Court relied on two notions that no longer have legal or practical vitality. First, the court observed that a bar candidate has no liberty interest in practicing law, "[n]or did the refusal to admit the petitioner to an examination take from him, by authority of the State, either liberty or property. The inalienable right of every American citizen to follow any of the common industrial occupations of life does not extend to the pursuit of professions or vocations of such a nature as to require peculiar skill or supervision for the public welfare. . . . To disbar an attorney is to deprive him of what, within

the meaning of our constitutions of government, may fairly be regarded as property. . . . But one who asks the privilege of admission to the bar is simply seeking to obtain a right of property which he has not got.

"The Superior Court, therefore, rightly declined to hear evidence as to questions the decision of which was entrusted to the State bar examining committee, and given to them only in case of those coming before them with the approval of the county bar." (Citations omitted.) Id., 55. Finding that the applicant had no constitutionally protected right to practice law, the court concluded, therefore, that a bar applicant has no due process rights to a fair application process. Id.

As noted, the reasoning of *O'Brien's Petition* as it relates to an applicant's rights in the bar admission process was later explicitly rejected by the United States Supreme Court, which affirmed that an applicant does, in fact, have a fundamental right to work in the occupation of his or her choosing and that a bar admission candidate is entitled, by the fourteenth amendment, to due process in the application procedure. Cf. *Leis* v. *Flynt*, supra, 439 U.S. 438; *Willner* v. *Committee on Character & Fitness*, supra, 373 U.S. 96; *Schware* v. *Board of Bar Examiners*, supra, 353 U.S. 232.

While this prong of the *O'Brien's Petition* opinion has not survived,[2] the second prong regarding the level of deference to accord a bar examining committee continues to enjoy judicial approbation notwithstanding substantial changes in the legal community and the changed nature of the bar's relationship to the judiciary. When *O'Brien's Petition* was decided, there existed a rule of practice that the state bar examining committee could recommend for admission only those candidates

---

[2] The portion of *O'Brien's Petition* holding that an applicant is not entitled to due process was expressly overruled in *In re Application of Dinan*, 157 Conn. 67, 72, 244 A.2d 608 (1968).

who had received favorable recommendations of the county bar. The court traced at length the pedigree of that rule back to the Inns of Court in England and updated it to accommodate the circumstances at hand. The court stated that "[t]he power of the courts over the admission of attorneys thus given or confirmed by the General Assembly, was exercised from the first in each county largely by the aid of the county bar. It was by this bar that the whole business of the civil courts was, until the closing quarter of the nineteenth century, mainly arranged and made ready for disposition. Assignments of cases for trial were made by the bar at meetings presided over by one of their own number, and standing rules were adopted at such meetings in regard, among other things, to the qualifications, examinations, and mode of admission of attorneys. . . . Being framed by the bar, these rules were known in each county as the 'rules of the bar,' although deriving their real authority from the sanction, expressed or implied, of the court in that county." (Citation omitted.) *O'Brien's Petition*, supra, 79 Conn. 50–51.

"The fundamental idea underlying this system of things was that the court could best ascertain the qualifications of one desiring to practice before it from the judgment of those under, or in association with, whom he had sought to prepare himself for that work, and who were already engaged in it themselves." Id., 53. The court continued, stating that "Connecticut, in her early days, was without any recognized centers of legal education like the ancient Inns of Court, but she had in each county the material for shaping a barrier, not dissimilar in kind, against the entrance of unworthy persons to engage in practice before her courts. It was found in the local bar, and the colonial usage of employing them for this purpose has been continued without a break to the present day. It is a reasonable usage. A court is but indifferently adapted to the task

of passing upon the qualifications for engaging in legal practice of those who appear before it as strangers, which are personal to themselves and independent of educational attainments. These can be easily determined by a bar, to some at least of whom they will not be strangers." Id.

To be sure, we have reshaped the application process and amended the rules of court so that a county bar's recommendation is no longer binding on the committee or the court and we have clearly made substantial improvements in the admissions process. Nevertheless, we have continued to import the reasoning of *O'Brien's Petition* concerning deference to the bar even though, I believe, it is no longer legally or factually persuasive as it relates to the reasonable contours of the bar admissions hearing process employed by the committee to determine fitness.[3]

Factually, I note that in 1907 there were fewer than 200 members of the Connecticut bar association.[4] Today, there are more than 11,000.[5] It is a reasonable inference from these numbers that, typically, the county bar no longer has any particular knowledge of a candidate's qualifications by reason of personal familiarity. Thus, the notion of entrusting the task to the bar on account of its members' more intimate familiarity of the candidate no longer pertains.

Despite the changed legal climate and an alteration in its factual underpinnings, the reasoning of *O'Brien's Petition* still permeates our decisions. Thus, as recently as 1999, we held that "[t]he standard of review in cases involving readmission to the bar was announced in

---

[3] See footnote 2.

[4] "A History of the First One Hundred Years of the Connecticut Bar Association: 1875-1975," 49 Conn. B.J. 201, 228 (V. Gordon ed. 1975).

[5] See the Connecticut bar association website at http://www.ctbar.org/public/resources.shtml.

*O'Brien's Petition*, [supra, 79 Conn. 55–56]. The court merely inquires whether readmission was denied after a fair investigation of the facts. Because the trial court exercises no discretion, but rather is confined to a review of the record before the [committee], we are not limited to the deferential standard of 'manifest abuse' or 'injustice' when reviewing its legal conclusions about the adequacy of the evidence before the [committee]. *Scott* v. *State Bar Examining Committee*, supra, 220 Conn. 823." (Internal quotation marks omitted.) *In re Application of Presnick*, 53 Conn. App. 174, 177, 728 A.2d 1159 (1999).

I believe that the changed legal climate, which now posits that an applicant has due process rights in the application process and that the determination of one's suitability is a judicial function, together with the changed factual climate that the bar, as a practical matter, has no special familiarity with an applicant, are good reasons to take a fresh look at the extent to which we, as a court, should defer to the bar regarding the admissions process.

I believe that a broad level of deference concerning the fairness of the process is not dictated either by the holdings of *Doe* v. *Connecticut Bar Examining Committee*, 263 Conn. 39, 818 A.2d 14 (2003), or *Scott* v. *State Bar Examining Committee*, supra, 220 Conn. 812. In *Doe*, the Supreme Court was confronted with a situation in which a trial judge clearly substituted his view of the facts for the committee's, thus according the committee no deference whatsoever. *Doe* v. *State Bar Examining Committee*, supra, 50–51. Similarly, in *Scott*, the Supreme Court, in reversing the judgment of the trial court, held that the trial court should not have substituted its assessment of the applicant's credibility and candor before the committee for that of the committee. *Scott* v. *State Bar Examining Committee*, supra, 825–26. I note, as well, that in *Scott*, the Supreme Court,

in an exercise of its judicial responsibilities, ordered the trial court to remand the petitioner's application to the committee "for a new hearing to review any additional relevant evidence submitted by the petitioner concerning his present fitness to practice law." Id., 829.

Having posited as a foundation that the determination of whether to grant or deny an application for admission to the bar is uniquely a judicial function does not, of course, suggest that no portion of this responsibility can be performed by a committee appointed by the court. And, indeed, our jurisprudence teaches us that, in confronting an appeal from a decision of the committee, the trial court should not conduct a hearing *de novo* or substitute its judgment for that of the committee, including its judgment concerning fitness, as long as there is adequate evidence in the record to support the committee's decision. Id., 825–26; see also *In re Application of Warren*, 149 Conn. 266, 178 A.2d 528 (1962).

While past cases have consistently adhered to a deferential standard of review of facts found by the committee, I have not found any appellate instruction applicable to the present situation concerning the level of scrutiny due from the court concerning the fairness of the committee's process and, specifically, what the standard of review should be when it is apparent that the committee, in determining an applicant's qualifications, has relied on materials outside of the hearing record. If we accord such latitude of deference to the findings of a committee that we render irrelevant the due process violations that take place in the process, then, by our passivity we have defaulted in our judicial responsibility and have reduced an applicant's liberty interest in practicing law to hollow verbiage. At the least, we should accord the term "evidence" a specific connotation, excluding unsworn statements, and testimony and written statements from witnesses not sub-

ject to cross-examination or confrontation, as well as evidence on issues not properly made the subject of notice in advance of the hearing.

In a somewhat analogous situation, we entrust to attorney trial referees the responsibility to make factual findings and recommendations in certain civil cases. Our standard of review in such cases requires us to determine whether the attorney trial referee's finding is clearly erroneous. On that basis, even if a finding is supported by some evidence, it will be held to be clearly erroneous if the reviewing court, on the basis of all the evidence, is left with the definite and firm conviction that a mistake has been committed by the fact finder. *Kallas* v. *Harnen*, 48 Conn. App. 253, 256, 709 A.2d 586, cert. denied, 244 Conn. 935, 717 A.2d 232 (1998). If in the context of civil litigation we accord the parties sufficient judicial oversight to ensure that the fact finder's conclusions are not clearly erroneous even if supported by some evidence in the resolution of their civil disputes, I believe we should accord at least as much review to applicants for the bar, who have, perforce, spent hours of study and expended substantial sums, often at great hardship, in anticipation of practicing their chosen profession. If we intend to be true to our jurisprudence that it is solely the judiciary's responsibility to be gatekeeper to the legal profession, then we cannot entirely abdicate our sentinel responsibilities.

My review of the record suggests that the petitioner was not afforded due process at several junctures in his application process. Since I believe that the majority has set forth fully the petitioner's procedural path, I will not recite it here. I will, however, cite certain intersections that trouble me. As a factual precursor, the record discloses that, at the law school hearing, none of the witnesses testified under oath. That has no significance to me as to the fairness of the law school hearing itself, but the unsworn nature of the testimony at the law

school hearing does bear on its reliability as evidence before the committee. A review of the committee's findings leaves no doubt that the committee utilized and relied on the law school proceedings in the formulation of its conclusions and recommendation. In its memorandum of decision, the committee stated: "The panel has also reviewed the application for admission filed by [the petitioner] and related documentation in the staff file, the record of proceedings relating to these questions at the Quinnipiac College School of Law, and a report and recommendation by the standing committee on recommendations for admission to the bar for Fairfield County."[6]

My concern is not merely formalistic. In the factual findings portion of its initial memorandum of decision, the committee stated: "The record also contains statements consistent with [Lynn] Fiore's testimony, in the form of the testimony of Matthew Goldzweig. Mr. Goldzweig was also a witness before the student discipline committee proceedings, and his testimony corroborated [Fiore's testimony] in all material details." While it is not clear from the committee's file whether the statements in its records from Goldzweig consisted only of his testimony at the law school hearing or included additional statements taken from him, two facts are clear from that revelation: (1) as part of its hearing process, the committee incorporated his unsworn testimony from the law school hearing; and (2) its recital after the hearing of its reliance on that statement did

---

[6] The reference in that statement to "related documentation in the staff file" also reveals that the committee utilized materials that were not part of its hearing record. In my review of that file, I found numerous statements from individuals not called as witnesses at the hearing. It is difficult to ascertain how, under that circumstance, the petitioner had the opportunity to confront or to cross-examine witnesses who made the statements contained in the committee staff file and apparently utilized by the committee, in part, as a basis for its recommendation to deny the petitioner admission to the bar.

not afford the petitioner either the opportunity to cross-examine Goldzweig or to confront him in the course of the hearing.[7] In addition to Goldzweig, the committee also heard from another "witness" who did not testify before the committee and who, therefore, was not available for cross-examination or confrontation.

On June 25, 1999, Fiore testified that she heard a conversation immediately before the law school examination between the petitioner and another student in the constitutional law class. Her testimony included the contents of the other student's statements to the petitioner. As to the comments by the other student to the petitioner, Fiore stated: "It was something to the effect of—it was either, why are you so nervous, everyone does it and doesn't admit it. Or what are you so nervous about, everyone does it, no one admits it." Referring to that testimony in its findings of facts, the committee, in its January 14, 2000 memorandum, stated: "[Fiore] testified that she had clearly seen the crib sheet in question in [the petitioner's] possession and being placed under his examination booklet, and also as to a conversation between him and another student from which an intent to cheat could be inferred." Thus, that hearsay testimony was admitted substantively and, significantly, it played a role in the committee's determination of the petitioner's fitness.[8]

---

[7] The law school hearing record reveals the following exchange between a professor, who conducted the hearing, and Goldzweig at the commencement of his "testimony:"

"[Professor]: We don't swear the witness, but, Mr. Goldzweig, you realize that the matters before the committee are important to both the people involved and the institution. We are going to be relying on what you say. Will you be honest and completely truthful in your answers?

"[The Witness]: Yes."

[8] I am aware that the petitioner, who was represented by counsel before the committee, did not specifically object to that testimony, although he had earlier, and that he subsequently attempted to object to testimony from Fiore concerning her recollection of overhearing a conversation between the petitioner and a third party, much to no avail. I am mindful, too, that in the eyes of any reasonable applicant, the committee serves the multiple

In affirming the committee's decision, the court, in repeating Fiore's testimony concerning the purported conversation between the petitioner and the other student, commented: "It is improper for the court to substitute its own assessment of the respective witnesses' credibility and candor for that of the [committee]. *Scott* v. *State Bar Examining Committee*, supra, 220 Conn. 825. The [committee's] decision to believe Fiore and to disbelieve [the petitioner] was a credibility decision that the [committee] was plainly entitled to make." Thus, it is apparent that not only the committee but the court, as well, credited that portion of Fiore's testimony consisting of statements made by an individual whose direct sworn testimony was not heard by any decision maker in this chain of events. In doing so, the court incorrectly accepted as evidence those facts impermissibly found by the committee in violation of the petitioner's due process rights to a fair hearing.

In addition to the due process violations attending the actual hearing, I believe the committee denied the petitioner due process by conducting a hearing and making findings on issues about which it failed to give him reasonable notice. At the outset, I acknowledge that the petitioner did not raise that issue at trial and he has not raised it properly on appeal.[9] Normally, an appellant's failure to raise a claim before the trial court or his failure to brief it on appeal forecloses appellate consideration of it. However, under the unusual circumstances of this case and in the exercise of our supervisory responsibility, I believe we should examine the question of whether the petitioner was given fair notice

purposes of investigator, inquirer, fact finder and, apparently, adjudicator. One must challenge the king ever so lightly if one cannot afford to kill him.

[9] The petitioner, however, did make note of the inaccurate notice. "The conclusion by the [committee] that [the petitioner] cheated does not appear to comport with the 'Notice of Hearing,' which states that what will be investigated is [the petitioner's] 'candor and credibility during the application process.'"

by the committee of the issue it intended to address with him at a hearing.

Here, our supervisory responsibility has two sources: Our obligation to ensure the proper administration of justice and our role as an overseer of the judiciary. "In certain instances, dictated by the interests of justice, we may, sua sponte, exercise our inherent supervisory power to review an unpreserved claim that has not been raised appropriately under the [*State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989)] or plain error doctrines." (Emphasis added.) *State* v. *Ramos*, 261 Conn. 156, 172 n.16, 801 A.2d 788 (2002). "Appellate courts possess an inherent supervisory authority over the administration of justice. . . . The standards that [are] set under this supervisory authority are not satisfied by observance of those minimal historic safeguards for securing trial by reasons which are summarized as due process of law . . . . Rather, the standards are flexible and are to be determined in the interests of justice. . . . [O]ur supervisory authority [however] is not a form of free-floating justice, untethered to legal principle. . . . Rather, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers. . . . [O]ur supervisory powers are invoked only in the rare circumstance where [the] traditional protections are inadequate to ensure the fair and just administration of the courts . . . ." (Internal quotation marks omitted.) *State* v. *Gentile*, 75 Conn. App. 839, 848, 818 A.2d 88, cert. denied, 263 Conn. 926, 823 A.2d 1218 (2003). I believe this is such a case.

Additionally, this case justifies the invocation of our supervisory powers as overseer of the judiciary. Cf. *State* v. *Miller*, 29 Conn. App. 207, 614 A.2d 1229 (1992), aff'd, 227 Conn. 363, 630 A.2d 1315 (1993). I come to that view because here, the committee acted not as an administrative agency, but as a committee of the judiciary itself. Thus, what the committee did, we do.

In that sense, we are more than an impartial reviewer; rather, we stand in review of our own comportment. I believe that heightened responsibility justifies the unusual step of a sua sponte review of whether the notice given to the applicant by the committee accorded him sufficient due process. I write on the notice issue separately also because that same issue could arise again in the event that the petitioner is given another hearing opportunity.

The record reveals that the content of the notice given to the petitioner by the committee does not correlate to the focus of its hearing or its factual findings. Pursuant to the authority given to the committee by the judges of the Superior Court to adopt regulations; see Practice Book § 2-4; the committee has adopted regulations to guide its process. Those regulations consist of nine articles. Article VI, entitled "Guidelines for Assessment of Character and Fitness," sets forth the procedure for conducting that part of the admissions investigation. It provides in relevant part: "a) The applicant shall be given the opportunity to demonstrate present good moral character despite particular past conduct. b) When the Committee has information weighing against a determination of good moral character: i) The applicant shall be notified of the information, and, ii) the applicant shall be provided the opportunity to submit such material as the applicant deems appropriate." It would appear that this regulation comports, facially, with a due process requirement of notice and an opportunity to be heard.

The notice issued to the petitioner states as follows:

"To: David Alan Friedman

"The Connecticut Bar Examining Committee will hold a hearing on your application for admission to the practice of law in Connecticut on Thursday, January 7, 1999, at 1:00 pm, at the Office of the Administrative

Director, 70 Washington Street, Hartford, CT 06106 (tel: 860-756-7901).

"The following matters will be discussed:

"Q#16: Applicant was charged with cheating on a law school exam and found, by the Student Discipline Committee, to have violated Student Conduct Code Section A. 2) and Section D, which decision was subsequently reversed by Dean [Neil H.] Cogan.

"Applicant's candor and credibility during the application process."

I believe that the invocation of "Q#16" in the committee notice was a reference to question sixteen on the bar admissions application completed by the petitioner as follows:

"Have you ever been expelled, suspended, placed on probation or been the subject of discipline by any college, university or law school? If so, explain."

Next to that question there were two boxes, one marked "Yes" and the other marked "No." The applicant completed the "Yes" box. In explanation, he stated: "I was charged once with using or attempting to use an unauthorized material during one of my first year exams. However, I was not convicted. In addition, absolutely no disciplinary sanctions were imposed."

From the content of the notice, I believe an applicant reasonably would assume that the committee hearing would consist of an examination into whether the applicant had candidly and credibly answered that question.[10] The candor of his response to question sixteen

---

[10] From a review of the committee hearing transcript, it is clear that, in his opening statement, the petitioner's counsel dwelt on the appropriateness of the applicant's answer to question sixteen in light of the fact that the dean of the law school had reversed the student disciplinary committee's decision. It was not until the chairperson of the committee panel introduced the subject of whether the petitioner had, in fact, cheated on the examination that the real purpose of the committee hearing became evident.

was not, however, the subject of the hearing. Nor was it the basis of the committee's recommendation that he not be admitted to practice. Rather, it is plain from the hearing transcript that the intent of the committee, notwithstanding the content of the notice, was to conduct a de novo examination of whether the applicant had cheated on the constitutional law examination, and not whether he had candidly and credibly responded to the question concerning the disposition of the charge, to wit, his statement that he had not been convicted and that no disciplinary sanctions had been imposed. Thus, although initially notified that the committee intended to examine him concerning whether he had been candid in answering question sixteen, the applicant found himself, at the hearing, confronted with a committee determined to investigate whether he had, in fact, cheated on an examination three and one-half years earlier.

The resulting unfairness is palpable. It is undisputed that the examination in question took place in May, 1995, at the end of the applicant's second semester in his first year of law school. He was notified by the law school of the charges against him in September, 1995. The school disciplinary hearing, first scheduled for April, 1996, actually began in August, 1996, and continued on three intermittent days, concluding on September 6, 1996. Ten days later, approximately fourteen months after the alleged incident, the disciplinary committee issued its decision. On January 24, 1997, however, (former) Dean Cogan reversed the committee's decision in response to an appeal by the petitioner. As the reason for reversing the committee's decision, Cogan wrote: "I have decided to reverse the decision of the Student Discipline Committee on the grounds that the delay in notifying [the petitioner] of the charges and the delay in bringing the charges to a hearing were

excessive and may have prejudiced [the petitioner's] defense against those charges."

By conducting a hearing on the substance of the complaint against the petitioner, the committee did in 1999 what Cogan thought it had been unfair to do in 1996 on the basis of timeliness. While I understand that the committee is not bound by the dean's sense of procedural propriety, a fair investigation consistent with the notice furnished to the petitioner should have developed information from the dean concerning the circumstances of his decision to reverse the determination of the student disciplinary committee, and the hearing should have focused on whether the applicant had candidly and credibly reported the outcome of the charges against him at the law school.

Since I believe that in this instance, the petitioner was not accorded due process by the committee and because the court failed to scrutinize adequately the fairness of the committee's investigation and hearing, I would reverse the judgment of the trial court with direction that the applicant be admitted to practice, or, as an alternative, that the applicant be afforded another hearing by the committee. At that hearing, however, the evidence should be confined to the subject about which the applicant has been given fair notice.

For the reasons stated, I respectfully dissent.