******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# DISCIPLINARY COUNSEL *v.* CHARLES B. SPADONI
## (AC 44826)

Bright, C. J., and Alvord and Norcott, Js.

*Syllabus*

The defendant appealed to this court from the trial court's judgment denying his application for reinstatement to the bar. The defendant had been suspended from the practice of law, upon presentment by the plaintiff, Disciplinary Counsel, following his conviction in federal court of obstruction of justice in connection with a public corruption scheme. The defendant also was convicted of other felony offenses, including racketeering, bribery and wire fraud, but those convictions were reversed on appeal. The defendant subsequently filed an application for reinstatement to the bar, and the trial court referred the application to the Standing Committee on Recommendations for Admission to the Bar for New Haven County pursuant to the applicable rule of practice (§ 2-53). The committee held an evidentiary hearing on the application, during which the defendant refused to answer direct questions regarding his conduct during and surrounding the events that resulted in the convictions that were reversed. The defendant also testified that he was innocent of any wrongdoing and that he had not committed the crime of obstruction of justice, focusing his testimony on multiple exhibits that he argued demonstrated his innocence. Following the hearing, the committee issued a report in which it recommended that the defendant's application for reinstatement be denied on the ground that he lacked the requisite good moral character to practice law. In reaching its decision, the committee found, inter alia, that the defendant's refusal to answer questions regarding the reversed convictions demonstrated a lack of honesty and candor, that his reinstatement could be detrimental to the integrity and standing of the bar and the administration of justice because he refused to accept responsibility for the obstruction of justice conviction, which strikes at the heart of the public trust in the legal profession, and that his failure to accept responsibility for his wrongdoing made rehabilitation impossible. A three judge panel of the Superior Court thereafter accepted the committee's recommendation and rendered judgment denying the defendant's application for reinstatement, concluding that the committee, in making its recommendation, did not abuse its discretion or act arbitrarily, unreasonably, or without a fair investigation of the facts. *Held*:

1. The trial court correctly determined that the committee had the authority to question the defendant about his presuspension misconduct; pursuant to Practice Book § 2-53, the committee had the authority and duty to investigate conduct that could inform its assessment of the defendant's moral fitness, including not only the underlying facts of the defendant's obstruction of justice conviction but also all of the facts that the committee believed could be relevant to the determination of the defendant's present fitness to practice law and moral character, and the defendant's argument that the committee had the authority to investigate only conduct of which he was convicted conflated the attorney reinstatement process with the attorney grievance process.

2. The defendant could not prevail on his claim that the committee improperly found that he failed to accept his obstruction of justice conviction with sincerity and honesty because he plausibly reconciled his claim of innocence with that conviction before the committee; contrary to the defendant's contention, his claim of innocence did not render the other criteria set forth in *Statewide Grievance Committee* v. *Ganim* (311 Conn. 430), for evaluating an application for reinstatement inapplicable but, rather, was simply another piece of evidence for the committee to consider in conjunction with all of the other factors utilized in determining whether the defendant met his burden to show rehabilitation, good moral character and a present fitness to be reinstated to the legal profession.

Argued March 9—officially released September 20, 2022

Presentment by the plaintiff for disciplinary proceedings following the defendant's felony conviction, brought to the Superior Court in the judicial district of Hartford, where the court, *Bryant, J.*, issued an order suspending the defendant from the practice of law on an interim basis; thereafter, the court, *Sheridan, J.*, rendered judgment suspending the defendant from the practice of law; subsequently, the defendant filed an application for reinstatement to the bar; thereafter, the defendant's application for reinstatement was referred to the Standing Committee on Recommendations for Admission to the Bar for New Haven County, which filed a report recommending denial of the application for reinstatement; subsequently, a three judge panel, *Sheridan, Budzik* and *Lynch, Js.*, accepted the standing committee's report and rendered judgment denying the defendant's application for reinstatement to the bar, from which the defendant appealed to this court. *Affirmed.*

*Charles B. Spadoni*, self-represented, the appellant (defendant).

*Paul C. Jensen, Jr.*, assistant bar counsel, with whom, on the brief, were *Brian B. Staines*, chief disciplinary counsel, and *Elizabeth M. Rowe*, assistant bar counsel, for the appellee (plaintiff).

*Opinion*

NORCOTT, J. The defendant, Charles B. Spadoni, an attorney suspended from the practice of law, appeals from the judgment of the Superior Court denying his application for reinstatement to the bar of this state. On appeal, the defendant claims that the three judge panel of the Superior Court considering the defendant's application for reinstatement to the bar improperly accepted the report and recommendation of the Standing Committee on Recommendations for Admission to the Bar for New Haven County (committee) because (1) the committee exceeded the scope of its investigative authority by inquiring as to the defendant's presuspension misconduct, and (2) the committee improperly found that the defendant failed to accept his federal conviction for obstruction of justice with sincerity and honesty. We disagree with the defendant and, therefore, affirm the judgment of the court.

The following facts and procedural history, as set forth in the court's memorandum of decision, are relevant to this appeal.[1] "The [defendant] was admitted to the Connecticut bar on May 3, 1977. . . . In 1997, the [defendant] was hired as the general counsel for a Boston based private equity firm, Triumph Capital Group [Inc.] (Triumph). *United States* v. *Triumph Capital Group, Inc.*, 544 F.3d 149, 152 (2d Cir. 2008). Triumph managed some of the investments of the state pension funds. Id., 152–53. Certain investments made by the state pension funds with Triumph, contributions made by Triumph to the state Republican party and contracts Triumph had with Republican candidate Paul Silvester's campaign staffers came under federal scrutiny. Id., 153. In connection with that scrutiny, on January 9, 2001, the [defendant] was indicted by a federal grand jury for committing various crimes under the Racketeer Influenced and Corrupt Organizations Act (RICO), [18 U.S.C. § 1961 et seq.]. Id., 156.

"On July 16, 2003, a jury found the [defendant] guilty of [racketeering, racketeering conspiracy] obstructing justice, bribery and [wire] fraud. Id., 156. The [defendant] was sentenced principally to concurrent [thirty-six] month terms of imprisonment on all counts and a $50,000 fine. Id., 158. Thereafter, the [defendant] appealed. On appeal, the [United States Court of Appeals for the] Second Circuit found there was sufficient evidence to support the jury's verdict, which found the [defendant] guilty of [racketeering, racketeering conspiracy] bribery, wire fraud and obstruction of justice. Id., 160, 169. The Second Circuit ordered a new trial on the racketeering, racketeering conspiracy, bribery and wire fraud charges on the ground that the government unconstitutionally suppressed material exculpatory and impeaching evidence. Id., 165. The Second Circuit did not order a new trial on the obstruction of justice charges, stating that, [e]ven if the suppressed

notes had an impeaching effect so strong as to call into question Silvester's testimony on other matters, the government's evidence of [the defendant's] obstruction of justice was overwhelming. In light of the forensic examiner's detailed testimony regarding the suspicious timing of the deletion of relevant files from [the defendant's] laptop using Destroy-It! software, and its corroboration with [Robert] Trevisani's testimony about [the defendant's] mention of Destroy-It! as software to be used in order to hide something . . . we do not think that the suppression of [Special] Agent [Charles E.] Urso's notes raises a reasonable probability that the verdict on the obstruction of justice count would have been different. . . . Id., 165 n.13.

"On November 10, 2008, the [defendant] and the government both filed motions for rehearing, and, on November 21, 2008, the Second Circuit denied both motions. The mandate issued on January 12, 2009. On November 16, 2009, the [defendant] served a copy of a motion to recall the mandate on the government, which was summarily denied by the Second Circuit on December 18, 2009. On September 15, 2011, the United States District Court for the District of Connecticut resentenced the [defendant] to two years of incarceration, a $50,000 fine and three years of supervised release. On July 9, 2012, the Second Circuit affirmed the judgment of conviction for obstruction of justice. *United States* v. *Spadoni*, 479 Fed. Appx. 392, 393 (2d Cir.), cert. denied, 568 U.S. 1019, 133 S. Ct. 625, 184 L. Ed. 2d 411 (2012). The [defendant's] license to practice law in Connecticut was suspended from January 31, 2007, through September 9, 2016." (Internal quotation marks omitted.)

On April 19, 2017, the defendant filed in the Superior Court an application for reinstatement to the bar pursuant to Practice Book § 2-53. On May 9, 2017, pursuant to Practice Book § 2-53 (f), the defendant's application was referred to the committee. On February 20, 2019, the committee held an evidentiary hearing on the defendant's application, at which the defendant was present and permitted to testify. At the reinstatement hearing, the defendant refused to answer direct questions regarding his conduct during or surrounding the events that resulted in his racketeering, racketeering conspiracy, bribery, and wire fraud convictions, which were reversed on appeal. Specifically, the defendant "took the position that any conduct which did not result in his conviction of a crime was off limits for [the committee] in assessing his character and fitness to practice law."[2] Further, when asked by committee member Howard K. Levine whether "the inquiry into [the defendant's] present moral fitness [allowed] . . . the committee to look into matters that are not the subject of grievances or criminal convictions," the defendant responded: "On a going forward basis, you have full rein, plenary power to do—whatever my moral fitness is. But . . . in terms

of moral fitness, it's really limited to the presuspension. It's the conviction and it's not—you cannot then use a conviction and then go back and try to resurrect or investigate . . . conduct that . . . didn't result in a conviction." The committee asked if the defendant would reconsider his refusal to answer its questions, but the defendant refused and stood on his objection.[3]

Before the committee, the defendant also stated affirmatively that he believed that he was innocent of any wrongdoing and that he had not committed the crime of obstruction of justice, even though his conviction on that charge had been affirmed on appeal. In support of his belief, the defendant testified that the Second Circuit "articulated no factual predicate that exists in the trial evidence for its holding that the jury had sufficient evidence to find [the defendant] guilty of obstructing justice." The defendant focused his direct testimony on multiple exhibits, including contracts, transcripts from the criminal trial, and affidavits that he argued demonstrated his innocence. Additionally, on cross-examination, the defendant stated that there was "insufficient evidence to find [him] guilty because . . . the finding of sufficiency was based on . . . [non-existent] evidence, and the allegation that . . . [he] failed to turn over a disk that had been called for . . . by a subpoena is not based on fact."

Ultimately, on February 5, 2021, the committee issued its written report in which it recommended that the defendant's application for reinstatement be denied because the defendant failed to meet the standards for good moral character to practice law as set forth in Practice Book § 2-5A. Specifically, the committee recommended that the defendant should not be reinstated because he "blatantly refused to accept his wrongdoing." The committee noted that, although the Second Circuit reversed the defendant's convictions of racketeering, racketeering conspiracy, bribery, and wire fraud, the court rejected the defendant's argument that there was insufficient evidence to support his conviction on those charges. Consequently, the committee concluded that inquiry regarding the defendant's conduct surrounding these charges was relevant because "these offenses [are] antithetical to the qualities necessary for an attorney to maintain the trust of the public. Engaging in such conduct evinces a lack of moral character, honesty and respect for the public, law enforcement and the judiciary which should be inherent to all members of the bar." The committee was not persuaded that the Second Circuit's reversal of the defendant's convictions on these charges "negates the nature and seriousness of the original jury findings to the point where the committee should not consider and place considerable weight on them." The committee, therefore, concluded that the defendant's failure to answer questions about those charges demonstrated that he lacked "honesty and candor" and "deprived the commit-

tee [of] the opportunity even to assess whether whatever conduct he may have engaged in leading up to his suspension did or did not uphold the requirement that the [defendant] be of good moral character. . . . [I]t is the [defendant's] lack of candor and honesty in refusing to answer that leads the committee to find that the [defendant] has not met his burden of proving he is of good moral character." (Footnotes omitted.)

Additionally, the committee found that "[t]he [defendant's] conviction for obstruction of justice strikes at the heart of public trust in the legal profession. Recognizing that the [defendant] continues to profess his innocence, the conviction stands and details his participation in a public corruption scheme. Obstruction of justice implicates all of the traits that the public expects members of the bar to possess, including honesty, respect for law enforcement and the judiciary. That the [defendant] continues to deny any responsibility for or even acknowledgment of the crime of which he was convicted serves only to amplify the committee's concerns that public confidence in the profession would be undermined by his [reinstatement]." The committee further noted that the defendant's refusal to accept responsibility for his obstruction of justice "makes rehabilitation an impossibility. There has been no acceptance of responsibility for his wrongdoing and, therefore, [the defendant] cannot possibly be rehabilitated." For these reasons, the committee recommended that the defendant's application for reinstatement be denied.

On June 1, 2021, an evidentiary hearing was held before a three judge panel of the Superior Court to determine whether to accept or reject the committee's recommendation that the defendant's application for reinstatement be denied. The Office of the Chief Disciplinary Counsel, the Statewide Grievance Committee, and the defendant all appeared and participated in the hearing. In its memorandum of decision, the court stated that, before both it and the committee, "the [defendant] offered only his own testimony with regard to his acceptance of responsibility and his recognition of the harm his violation of federal criminal law has caused to the legal profession and the public."

On June 30, 2021, the court, by way of a memorandum of decision, unanimously accepted the committee's recommendation and denied the defendant's application for reinstatement. In doing so, the court reiterated the committee's concerns regarding the defendant's return to practice and evaluated the record along with the defendant's candor and demeanor as he responded to questions from the court. Having done so, the court reasoned that it could not "conclude that the committee acted arbitrarily or unreasonably or in abuse of its discretion or without a fair investigation of the facts in recommending that the [defendant] not be readmitted to the practice of law in Connecticut." This appeal fol-

lowed.

Because both of the defendant's claims pertain to the attorney reinstatement process, we first discuss that procedure and the applicable standards of review. "Fixing the qualifications for, as well as admitting [or readmitting] persons to, the practice of law in this state has ever been an exercise of judicial power. . . . This power has been exercised with the assistance of committees of the bar appointed and acting under rules of court. . . . Although these committees have a broad power of discretion, they act under the court's supervision. . . . Accordingly, [i]t is the court, and not the bar, or a committee, which takes the final and decisive action.

"In deciding whether to accept or reject a standing committee recommendation on reinstatement to the bar, the trial court does not take evidence or hear the matter de novo. . . . Rather, it reviews the standing committee's decision on [the] record to determine whether [the standing committee] has conducted a fair and impartial investigation, and whether it acted fairly and reasonably or from prejudice and ill will in its consideration of the application. . . . Ultimately, the court must decide whether the standing committee, by approving or withholding its approval of an application, acted arbitrarily or unreasonably or in abuse of its discretion or without a fair investigation of the facts. . . . In either admission or readmission proceedings, the burden is on an applicant to prove his or her present fitness to practice law. . . .

"As to any subordinate facts found by a standing committee, the trial court reviews them only for clear error. A factual determination is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . The standing committee, as fact finder, determines with finality the credibility of witnesses and the weight to be accorded their testimony. . . . At the same time, [t]he ultimate facts [found by a standing committee] are reviewable by the court to determine whether they are reasonable and proper in view of the subordinate facts found and the applicable principles of law." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Statewide Grievance Committee* v. *Ganim*, 311 Conn. 430, 450–52, 87 A.3d 1078 (2014).

Ultimately, "[b]ecause the trial court exercises no discretion, but rather is confined to a review of the record before the [standing committee], we are not limited to the deferential standard of manifest abuse or injustice when reviewing [the trial court's] legal conclusions about the adequacy of the evidence before the [standing committee] . . . ." (Internal quotation marks omitted.) Id., 452. Instead, our "review of the trial

court's decision, to either accept or reject the standing committee's recommendation, is plenary." Id.

We now turn to the language of Practice Book § 2-53, which governs the application process for a suspended attorney to be reinstated to the bar. Particularly, § 2-53 (a)[4] provides that an attorney who has been suspended is permitted to file an application for reinstatement. "The application shall be referred by the clerk of the Superior Court where it is filed to the chief justice or designee, who shall refer the matter to a standing committee on recommendations for admission to the bar . . . ." Practice Book § 2-53 (f). Then, the committee to which an application for reinstatement has been referred, "shall investigate the application, hold hearings pertaining thereto and render a report with its recommendations to the court." Practice Book § 2-53 (i).

I

The defendant first claims that the court improperly accepted the report by the committee because the committee exceeded the scope of its investigative authority by inquiring as to the defendant's presuspension misconduct. Specifically, the defendant argues that the committee's inquiry into his actions that served as the basis for his racketeering, racketeering conspiracy, wire fraud, and bribery convictions, and the conclusions it drew from his refusal to answer questions about those actions, were improper because those convictions were reversed by the Second Circuit and the scope of the committee's investigation does not include alleged but unajudicated misconduct.[5] We disagree.

We begin with the general principles and standards of review that govern our resolution of the defendant's first claim. We interpret the defendant's claim to be challenging the scope of the committee's investigation pursuant to Practice Book § 2-53, not the court's acceptance of the committee's recommendation. Consequently, to the extent that we are interpreting the relevant sections of the rules of practice, our review is plenary. See, e.g., *Wiseman* v. *Armstrong*, 295 Conn. 94, 99, 989 A.2d 1027 (2010).

We next outline the duties and limits of a committee's investigation and adjudication of an application for reinstatement. Throughout the reinstatement process, Practice Book § 2-53 (j) instructs that "[i]t is the applicant's burden to demonstrate by clear and convincing evidence that he or she possesses good moral character and fitness to practice law as defined by Section 2-5A." Practice Book § 2-5A provides: "(a) Good moral character shall be construed to include, but not be limited to, the following: (1) The qualities of honesty, fairness, candor and trustworthiness; (2) Observance of fiduciary responsibility; (3) Respect for and obedience to the law; and (4) Respect for the legal rights of others

and the judicial process, as evidenced by conduct other than merely initiating or pursuing litigation. (b) Fitness to practice law shall be construed to include the following: (1) The cognitive capacity to undertake fundamental lawyering skills such as problem solving, legal analysis and reasoning, legal research, factual investigation, organization and management of legal work, making appropriate reasoned legal judgments, and recognizing and solving ethical dilemmas; (2) The ability to communicate legal judgments and legal information to clients, other attorneys, judicial and regulatory authorities, with or without the use of aids or devices; and (3) The capability to perform legal tasks in a timely manner.''

As stated by our Supreme Court, ''[o]ur rules of practice do not enumerate specific criteria to be used in evaluating an application for reinstatement to the bar. Connecticut courts and those of other jurisdictions, however, have relied on several considerations, however, among them the following: (1) the [applicant's] present moral fitness; (2) the [applicant's] acceptance of wrongdoing with sincerity and honesty; (3) the extent of the [applicant's] rehabilitation; (4) the nature and seriousness of the original misconduct; (5) the [applicant's] conduct following the discipline; (6) the time elapsed since the original discipline; (7) the [applicant's] character, maturity, and experience at the time of discipline and at present; (8) the [applicant's] current competency and qualifications to practice law; (9) [the applicant's payment of] restitution; and (10) the proof that the [applicant's] return to the practice of law will not be detrimental to the integrity and standing of the bar or the administration of justice, or subversive of the public interest.'' (Internal quotation marks omitted.) *Statewide Grievance Committee* v. *Ganim*, supra, 311 Conn. 454–55.

''[W]hen courts consider the evidence introduced in reinstatement proceedings of an applicant's current fitness, they must evaluate it against the backdrop of the applicant's prior misconduct, and [inquire] whether the former is of sufficient weight to overcome the latter.'' (Internal quotation marks omitted.) Id., 456. As such, ''[a]n attorney's commission of misconduct that results in criminal convictions, particularly for crimes that involve elements of dishonesty, casts a dark shadow over his or her fitness to practice law, and typically results in a lengthy period of suspension or disbarment.'' (Footnote omitted.) Id., 457.

In the reinstatement process, ''[t]he court's fundamental inquiry in addressing a petition for reinstatement to the practice of law is whether the attorney has rehabilitated himself or herself in conduct and character since the suspension was imposed. . . . The applicant must show that he is presently fit to again exercise the privileges and functions of an attorney as an officer of the court and confidential manager of the affairs and

business of others entrusted to his care . . . keeping . . . in view . . . his previous misconduct, his discipline therefor, and any reformation of character wrought thereby or otherwise as shown by his more recent life and conduct." (Citation omitted; internal quotation marks omitted.) Id., 453. Specifically, "[t]he appropriate inquiry when deciding whether to grant admission to the bar is whether the applicant has *present* fitness to practice law. . . . Fitness to practice law does not remain fixed in time." (Citations omitted; emphasis in original.) *Scott* v. *State Bar Examining Committee*, 220 Conn. 812, 829, 601 A.2d 1021 (1992).[6]

Accordingly, it is clear that a committee's consideration of an applicant's present good moral character is an expansive inquiry. The committee may consider the applicant's conduct prior to or after his or her suspension, regardless of whether that conduct served as the basis for his or her suspension. The committee may also consider all conduct in determining the applicant's present fitness. For example, in *Scott* v. *State Bar Examining Committee*, supra, 220 Conn. 815, the applicant for admission sat for the state bar examination in July, 1987, which he passed. Nevertheless, the Bar Examining Committee voted unanimously to deny him admission to the bar on the basis of both its and the local standing committee's investigation into the applicant's past criminal record. Id. The standing committee conducted a hearing in which it questioned the applicant about both his criminal record, as well as his prior drug use. Id. The standing committee, and later the executive committee of the Bar Examining Committee, conducted hearings that involved the applicant's history dating back to marijuana use between 1977 and 1985. Id., 814. More specifically, the hearings investigated the following events: "In 1981, the [applicant] was arrested and charged with possession of controlled drugs and possession of [marijuana]. The possession of controlled drugs charge was nolled and the [applicant] paid an $85 fine for possession of [marijuana]. He was convicted of possession of [marijuana] for a second time in 1983 and paid a $385 fine. The [applicant's] last drug related conviction occurred in 1984, when he was arrested and charged with interfering with a police officer and possession of a controlled substance. The interference charge was nolled, and he paid a $250 fine for possession of a controlled substance. The [applicant] has also been cited for failing to register a change of address with the [Department of Motor Vehicles], failure to carry his registration, illegal dumping, failure to carry an insurance card, making an improper left turn and failure to have insurance. Furthermore, at the age of seventeen, he was adjudicated as a youthful offender on a charge of criminal attempt to commit burglary." Id., 814 n.2. All of this conduct, regardless of the timing or final adjudication was investigated in relation to the applicant's admission to the bar. Id., 815. On the basis of

the information learned during its investigation, the Bar Examining Committee members denied the applicant admission to the bar because he had three convictions involving illegal substances, his explanation of his criminal prosecutions was not credible, and he "displayed a lack of candor and did not appreciate the importance of his testimony at the hearing." (Internal quotation marks omitted.) Id., 816. The applicant appealed to the Superior Court, which reversed the decision of the Bar Examining Committee and ordered the applicant admitted to the bar. Id., 813–14. The Bar Examining Committee appealed to this court, and the appeal was transferred to our Supreme Court, which reversed the judgment of the Superior Court. Id., 814. Specifically, our Supreme Court noted that the rules of practice delegated to the Bar Examining Committee, "the duty, power and authority to . . . determine whether such candidates are qualified . . . ." (Emphasis omitted; internal quotation marks omitted.) Id., 825–26. Therefore, the court held that the Bar Examining Committee was within its authority to question the applicant about all prior arrests, even those that were nolled or did not result in a conviction, in order to consider the applicant's candor and credibility when assessing his moral fitness. Id., 825. It further concluded that "[i]t was improper for the trial court . . . to substitute its own assessment of the [applicant's] credibility and candor for that of the [Bar Examining Committee]." Id.

In the present case, the defendant challenges the committee's authority to delve into and adjudicate "alleged but unadjudicated, presuspension misconduct . . . ." Particularly, the defendant challenges the committee's attempted questioning regarding conduct related to his convictions that were reversed on appeal. As in *Scott*, the committee had the authority to investigate conduct that could play a role in its assessment of the defendant's moral fitness. See *Scott* v. *State Bar Examining Committee*, supra, 220 Conn. 825–26. In the present case, this included not only the underlying facts of the defendant's obstruction of justice conviction, but also all of the facts that the committee believed could be relevant to the determination of the defendant's present fitness to practice law, as well as his good moral character. Not only did the committee have the authority to do so, but the rules of practice charge it with investigating such conduct. See Practice Book § 2-53 (i). Ultimately, the committee had a duty to undertake a fair investigation of the facts by exploring the defendant's moral character. See *Statewide Grievance Committee* v. *Ganim*, supra, 311 Conn. 463–64.

Although the defendant argues[7] that the committee only had the authority to investigate conduct of which he was convicted, specifically his obstruction of justice conviction, this argument appears to conflate the reinstatement process pursuant to Practice Book § 2-53 with the grievance process pursuant to Practice Book

§ 2-32. As discussed previously, the committee's inquiry to determine whether to reinstate a suspended applicant is unbound in time. See *Scott* v. *State Bar Examining Committee*, supra, 220 Conn. 829. Conversely, Practice Book § 2-32 (a) (2) (E) permits the dismissal of a grievance complaint that is founded on allegations that occurred more than six years prior to the filing of such a complaint. This court previously has held that "attorney grievance proceedings and bar admission proceedings are quite different; we therefore do not accept the petitioner's invitation to draw an analogy between the two. . . . The burden in grievance proceedings is on the statewide grievance committee to establish the occurrence of an ethics violation by clear and convincing proof. . . . The ultimate burden of proving good moral character required for admission to the bar, however, is on the applicant." (Citations omitted; internal quotation marks omitted.) *Friedman* v. *Connecticut Bar Examining Committee*, 77 Conn. App. 526, 541, 824 A.2d 866 (2003), appeal dismissed, 270 Conn. 457, 853 A.2d 496 (2004). Therefore, with the foregoing principles in mind, we conclude that the court correctly determined that the committee had the authority to question the defendant about his presuspension misconduct.

II

The defendant's second claim is that the committee improperly found that he failed to accept his obstruction of justice conviction with sincerity and honesty. The defendant argues that he was not required to do so because he proved to the committee that he plausibly reconciled his claim of innocence and, additionally, that the remaining criteria set forth in *Ganim* for the court to utilize in the evaluation of an application for reinstatement are not applicable. We disagree.

We begin with the general principles and standards of review that govern our resolution of the defendant's second claim. "[W]hen reviewing the legal conclusions of the trial court concerning the adequacy of evidence before the [committee], we need only determine whether the [committee's] finding, that the [applicant] lacked good moral character, is supported in the record of the application proceedings." (Internal quotation marks omitted.) Id., 529. "Ultimately, the court must decide whether the . . . committee, by approving or withholding its approval of an application, acted arbitrarily or unreasonably or in abuse of its discretion or without a fair investigation of the facts." (Internal quotation marks omitted.) *Statewide Grievance Committee* v. *Ganim*, supra, 311 Conn. 451.

Along with the considerations for reinstatement set forth by our Supreme Court in *Ganim*, we reiterate that, "[i]n either admission or readmission proceedings, the burden is on an applicant to prove his or her present fitness to practice law." Id. In *Ganim*, our Supreme Court stated that "the defendant's failure to either

explain, or acknowledge any responsibility for, his extensive criminal wrongdoing, or to express remorse for that wrongdoing, was a highly relevant consideration . . . ." Id., 463. The court noted that, although this type of acknowledgement in the reinstatement process is not required, it is one of the many factors that must be examined. See id., 464 n.32.

The defendant contends that *Ganim* stands for the proposition that, in a reinstatement proceeding in which the applicant maintains his innocence, even after his conviction is upheld on appeal, the applicant is not required to accept his established conviction if his claim of innocence plausibly can be reconciled with his conviction. The defendant argues that he appropriately reconciled his claim of innocence with his obstruction of justice conviction before the committee, and, therefore, the committee improperly relied on his failure to accept responsibility for that conviction and to admit his wrongdoing in recommending that he not be reinstated to the bar.

In support of this claim, the only law to which the defendant cites are two footnotes from *Ganim*. See id., 464 n.32; id., 466 n.33. The first footnote provides: "The defendant contends that the trial court improperly held, as a matter of law, that he necessarily had to be found remorseful, or acknowledge his criminal wrongdoing, before he could be found presently fit to practice law. According to the defendant, the court considered remorse and acknowledgment of wrongdoing to be a bright line requirement for readmission, and such a requirement is not prescribed by statute or court rule . . . . We recognize that the trial court did devote a significant portion of its analysis to the issue of the defendant's lack of remorse, and it ended that section of its memorandum of decision by concluding that the standing committee improperly found that [the defendant] was remorseful or acknowledged that he engaged in the criminal misconduct, which are necessary components of rehabilitation and a finding of present fitness. . . . At the same time, however . . . it is clear that lack of remorse was not the sole basis for the court's ultimate determination that the defendant had not met his burden of proving present fitness.

"To the extent the trial court's decision can be read as stating a hard and fast rule requiring remorse, in all cases, as an absolute condition for reinstatement, we disavow it as legally incorrect. Nevertheless . . . the defendant's lack of remorse, particularly as it was not accompanied by an explicit profession of innocence and plausible explanation for his sixteen criminal convictions, certainly was a proper consideration in this case, even if it was not a dispositive one. Additionally, even putting aside the issue of the defendant's remorse, or lack thereof, we still would conclude that the other probative and credited evidence in the record was not

sufficient to support the standing committee's finding of present fitness. Accordingly, any error by the trial court in this regard was of no consequence." (Emphasis omitted; internal quotation marks omitted.) Id., 464 n.32.

Additionally, the second footnote on which the defendant relies provides: "In a reinstatement proceeding, an applicant's previous criminal convictions, upheld on appeal, are treated as conclusive evidence that the applicant in fact engaged in conduct that was seriously wrong. . . . Unless this premise somehow is shown to be faulty, an applicant's subjective belief that he did not in fact engage in wrongful conduct suggests two other possibilities. The first possibility is that the [applicant] is, for whatever reason, in such a state of denial as to be unable to appreciate the difference between reality and imagination with respect to what he did and did not do. If this is the case, a necessary premise for rehabilitation (and for the ability to practice law)—the ability to appreciate the reality of what one is doing and has done—is missing from the [applicant].

"The second possibility is that the [applicant's] ability to form reasonably acceptable moral and legal conclusions about his conduct—and his ability to appreciate and apply the commonly-agreed upon meaning of the law and the ethical requirements of the legal profession—are so far from adequate that he similarly has no business practicing law. . . . These were possibilities that the standing committee should have explored in the present case." (Citations omitted; internal quotation marks omitted.) Id., 466 n.33.

These two footnotes simply do not stand for the proposition that an individual need not exhibit good moral character under the criteria set forth in *Ganim*, even if an individual plausibly reconciles his or her claim of innocence with the evidence that formed the basis of his or her conviction. Instead, as the court in *Ganim* stated, an applicant's "denial of responsibility, like the convictions themselves, is simply another piece of evidence to consider, and to be given such weight as it deserves in light of the circumstances." (Internal quotation marks omitted.) Id., 465.

"The law requires a reformation of character as demonstrated by an applicant's more recent life and conduct. The more egregious the misconduct resulting in disbarment, the greater the proof of moral character and trustworthiness required for reinstatement." (Internal quotation marks omitted.) *Statewide Grievance Committee* v. *Rapoport*, 119 Conn. App. 269, 282, 987 A.2d 1075, cert. denied, 297 Conn. 907, 995 A.2d 639 (2010). "Thus, when courts consider the evidence introduced in reinstatement proceedings of an applicant's current fitness, they must evaluate it against the backdrop of the applicant's prior misconduct, and [inquire] whether the former is of sufficient weight to overcome

the latter." (Internal quotation marks omitted.) *State-wide Grievance Committee* v. *Ganim*, supra, 311 Conn. 456.

In the present case, the defendant argues that he did not need to accept his established conviction with sincerity and honesty because he proved his claim of innocence to the committee. This argument only further exhibits the defendant's confusion with the reinstatement process, particularly, his belief that his claim of innocence presupposes that all other criteria from *Ganim* are met, which is simply not what the committee found. The committee was not investigating or recommending guilt or innocence; instead, the committee was charged with determining whether the defendant had been rehabilitated, as well as whether he possessed good moral character and the requisite fitness to practice law, which must all be "viewed against the backdrop of the defendant's misconduct and the disrepute it brought" to both the defendant and the legal profession. Id., 462.

Although this failure to acknowledge or express remorse for misconduct is not the sole factor determinative of the defendant's application for reinstatement, it was appropriate for the committee to consider, particularly in light of its concerns about the defendant's candor and demeanor before the committee. See id., 464–65. Additionally, it plays a role in whether the defendant has exhibited to the committee that he has been rehabilitated since his conviction. Particularly, the committee expressed significant concerns that more than ten years had passed since the defendant's suspension, but he continues to insist that he did not commit any wrongdoing. This led the committee to state that rehabilitation would be impossible so long as the defendant fails to acknowledge that he committed a crime. Thus, although failing to acknowledge or exhibit remorse for his misconduct does not alone bar the defendant's application for reinstatement, it may be considered in conjunction with all of the other factors utilized to determine if the defendant has met his burden to show rehabilitation, good moral character, and a present fitness to be reinstated to the legal profession.[8] See id., 467.

Accordingly, we conclude that the court did not err in finding that the committee did not act arbitrarily or unreasonably, or in abuse of its discretion when issuing its recommendation that the defendant's application for reinstatement to the bar be denied.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] On appeal, the defendant does not challenge any of the facts found by the committee and adopted by the court.

[2] At the reinstatement hearing, during the assistant bar counsel's cross-examination of the defendant, when asked about a certain conversation with Silvester, the defendant stated: "Well, what is—I'm now going to object because we're really going into areas beyond the scope of my—my direct and—and I was charged with campaign bribery, which I was acquitted of.

So all these questions now are irrelevant, and I object to continuing this line of inquiry."

The following colloquy then took place between committee member Howard K. Levine and the defendant:

"Q. I have just one question, and I appreciate you engaging in this with me. One of the [*Statewide Grievance Committee* v. *Ganim*, 311 Conn. 430, 87 A.3d 1078 (2014)] factors is the applicant's character, maturity and experience at the time of discipline and at present. Again, is it your position that that limits the inquiry solely to those matters that comprised of your conviction and does not allow either counsel or the committee to inquire into matters upon which you were acquitted or matters which were not the subject of a grievance?

"A. Yes, unless the—I don't prevail in demonstrating that I was innocent, then that fact would rise. But if I'm demonstrating that I'm innocent then it doesn't get—you don't get to go back and start, make the entry."

[3] The following colloquy took place at the reinstatement hearing between Levine and the defendant:

"Q. Okay. Mr. Spadoni, if we gave you the opportunity, fully understanding your legal position, if we gave you [the] opportunity now for [the assistant bar counsel] to ask you those questions again, would you still stand on your legal position or would you answer the questions?

"A. I would stand on my legal position because it's—and I don't think you have the authority—this is not the forum. That—that train left. You know, when I was—when I was—they could have filed a grievance which can be independent."

[4] Practice Book § 2-53 (a) provides in relevant part: "An attorney who has been suspended from the practice of law in this state for a period of one year or more or has remained under suspension pursuant to an order of interim suspension for a period of one year or more shall be required to apply for reinstatement in accordance with this section, unless the court that imposed the discipline expressly provided in its order that such application is not required. . . ."

[5] The defendant, without any direct citation to legal authority, frames his first claim as challenging the committee's "subject matter jurisdiction" to investigate certain allegations against him. We disagree with the defendant's characterization. "Subject matter jurisdiction involves the authority of a court to adjudicate the type of controversy presented by the action before it. . . . A court does not truly lack subject matter jurisdiction if it has competence to entertain the action before it." (Internal quotation marks omitted.) *Wolfork* v. *Yale Medical Group*, 335 Conn. 448, 463, 239 A.3d 272 (2020). Here, there is no dispute that the committee had the authority to adjudicate the defendant's application for reinstatement; rather, the defendant's claim challenges whether the committee's inquiry into his presuspension misconduct was proper.

[6] Although *Scott* involved admission to the bar and not reinstatement following suspension, cases involving a committee's investigation of an individual's application for admission are applicable here because, as stated by our Supreme Court, "[i]n either admission or readmission proceedings, the burden is on an applicant to prove his or her present fitness to practice law." *Statewide Grievance Committee* v. *Ganim*, supra, 311 Conn. 451.

[7] The defendant also argues that, because the committee did not have authority to adjudicate or investigate the facts underlying the racketeering, racketeering conspiracy, wire fraud, and bribery allegations, the committee's findings of fact that are based on his refusal to answer questions concerning those allegations are void as a matter of law. In support of this argument, the defendant fails to cite any legal authority, and, therefore, we decline to review it because it is inadequately briefed. See *Marvin* v. *Board of Education*, 191 Conn. App. 169, 178 n.8, 213 A.3d 1155 (2019) ("Claims are inadequately briefed when they are merely mentioned and not briefed beyond a bare assertion. . . . Claims are also inadequately briefed when they . . . consist of conclusory assertions . . . with no mention of relevant authority and minimal or no citations from the record . . . ." (Internal quotation marks omitted.)).

[8] It must be restated that "[a]ttorney discipline exists for the purpose of preserving the courts of justice from the official ministration of persons unfit to practise in them. . . . An attorney as an officer of the court in the administration of justice, is continually accountable to it for the manner in which he exercises the privilege which has been accorded him. His admission is upon the implied condition that his continued enjoyment of the right conferred is dependent upon his remaining a fit and safe person to exercise

it, so that when he, by misconduct in any capacity, discloses that he has become or is an unfit or unsafe person to be entrusted with the responsibilities and obligations of an attorney, his right to continue in the enjoyment of his professional privilege may and ought to be declared forfeited. . . . Therefore, [i]f a court disciplines an attorney, it does so not to mete out punishment to an offender, but [so] that the administration of justice may be safeguarded and the courts and the public protected from the misconduct or unfitness of those who are licensed to perform the important functions of the legal profession." (Internal quotation marks omitted.) *Statewide Grievance Committee* v. *Ganim,* supra, 311 Conn. 452–53.

———————————————